May it please the court. My name is Kennedy Thompson and I, along with my dad, represent Dexter Edwards. We are honored to be here and we appreciate the court giving us the opportunity to be heard. With that being said, respectfully, we think the lower court erred in a litany of ways on the defendant's motion for summary judgment as well as the plaintiff's motion for summary judgment or judgment on the pleadings. To start with, our client, Dexter Edwards, had been in business with Genex Cooperative, Inc. since approximately 1999 or 2000 in the business of filling liquid nitrogen tanks. These are some interesting facts. I don't think I've ever seen anything like them. But, I mean, it was very interesting, particularly eastern North Carolina. I'm very familiar with the area. I didn't even know the business was there. So, you know, this all comes down to this whole issue of summary judgment, failure to monitor aspect of it from your client's perspective. Speak directly to that. Okay. With the failure to monitor perspective, I first of all want the court to be aware of our client had been in business for 15 years with Genex. There was no written contracts in place and we would argue there's still no written contract in place at all. You mean that piece of paper that has the name of the son up there is not a written contract? Yes, sir. And if the court will allow me, I'll be happy to examine that and then go into the monitoring. Sure. So, first of all. Because it looks like a contract. Okay. We have seven tanks on the farm. When we filed this complaint, we alleged a breach of contract. We did not allege a breach of a written contract. Our client was not even aware of these written contracts until defense counsel filed an answer and attached a written contract. If you look at their first answer, it refers to a serial number. How could that be if the son signed the contract? How could it be that your client wasn't aware of the written contract? The son was the farm manager. Right. So, he was presented this purported contract. I guess your argument is he didn't have authority, either apparent or otherwise. I do, but if you allow me, I wanted to point out one other thing. The first contract that was filed in the original answer relates to a serial number D-1814. That tank is not on the farm and nor was it on the farm on the date of the alleged breach. Can you go back to answering Judge Diaz's question? As far as apparent authority? I'm sorry. Yes, but how is it not a contract when the son signed it? How and how also, I think your question, I don't know if you can speak to your question, but how can you say they weren't aware of it? When the son signed it and as you say, he's the farm manager. Yes. First of all, he didn't sign the actual agreement that says this agreement will terminate at 60 days notice and Gen X and the customer name below enter into this agreement dated August 23, 2004. There's no signature there. At a minimum, though, he signed probably the most important part of the contract, which waived the right to recover consequential damages. Yes, and most importantly, the contract that you're referring to is not a contract that's in question of this lawsuit. That contract in the original answer is D-1814. That is not a tank. That's the subject of this litigation. Out of the four contracts that defense counsel attached to their amended complaint, only one of those four contracts applies to a claim of a tank that we're claiming damages for. And coincidentally and ironically, that particular tank that we're saying it was damaged is our least amount of damage because it only had semen in it. The crux of our damages in our case are dealing with embryo. Defense has offered no written contracts for any of our three tanks that have the embryo in it, and that's where the entire damages are in this case. There's simply no contract that's been signed that defense counsel can produce nor that we can find that there's a written contract in existence for it. Well, then, so let's assume that's correct, but then I guess you need to go back to Judge Wynn's question about because the failure to monitor cuts across all of these issues. Yes, sir. Thank you. The failure to monitor and also address something else. If it's an oral contract, you don't have a 60-day notice of Gastonia versus Duke Power. It can be terminal at will, but under that case, it also says you have to give reasonable notice. And the defendant in this case, under their request for interrogatories, answered that it was customary to give 60 days notice before breaching, and also that it was an inadvertent error that they didn't give 60 days notice in this case. Mind you, the court held that they did give valid notice, but the defendant admitted in his interrogatories that it did not. With that being said, it's customary, and the case law says that they give reasonable notice, and we're not particularly arguing that they didn't give reasonable notice, but what we did is detrimentally rely on that notice, which was clearly an error that an August 31st fill was put in the tanks, and that was not done. So we argue that the defendant is equitably stopped under the three prongs that that will stop him from... So you get the reasonable notice, which is when you have a continuous performance situation, it really becomes clear. You have an instance in which a performance occurs, and then a great period of time before the next performance is required, and the intervening time is terminated before the next one comes up. The issue becomes back to what Judge Diaz has alluded to is, okay, so he said he did it on August 31st. In fact, it was July 13th. Correct. How does the failure to monitor come into play there? I mean, these tanks, as I understand it, they're in the office, right? Correct. And do you walk by them every day? Yes, sir. And I would argue to the point that that is... There's a tag on the tanks. Well, there's a tag on one of the seven tanks that we were not even made aware of. But you're walking about them every day, and the idea... Of course, I had no idea would dissipate like that over a period of time or be used up like sort of like gases you use up when you're burning something. Yes, sir. There must be some sort of principle. I don't need to know that. But the point being is you got to make sure that tank has that nitrogen, that liquid What period of time did they not look at the tanks? So just because you're walking by them and don't actually go into the tanks and open up... Sorry, open up the container doesn't mean you're not monitoring it. In fact, that can be detrimental. Didn't they have millions of dollars at stake inside those tanks? Yes, sir. And that's exactly why... Who would not look in that tank periodically to make sure that millions of dollars are being secured? Well, Judge, what didn't monitor the tanks. If you actually open up the container, that lets the LN2 out, so therefore it can dissipate and damage your product. How do they monitor them? Because if the tanks are defective, our experts said there would be loss of vacuum just because you can see if there's a defective tank and it's dying by the condensation. These tanks were on rubber mats. Now, what is it they did to monitor them? They were in the office right there every day where Nicholas... Okay, and then what did they do to monitor? They could look at them every day. If you even look at Corey Peters, who was the defendant's territory sales manager, he said that visual inspections were done all the time. They could be done visually. You mean visual inspection of the exterior of the tank? He said in his depositions, visual inspection. Well, what does that mean? Well, I would submit to the court that that means when you're in-season, in-breeding season, obviously you're going into the tanks to get out embryo and semen. You check those with a dipstick, which was done. It's in testimony. It was done. When you're in off-season, you visually inspect those. You don't want to go in all the time because the LN2 could dissipate. You're looking at them from the outside. Correct. You say that that's the standard for inspection during the off-season. I do. I at least think that's a jury question at the very minimum. What is it looking at them from the outside tells you? What do you see? If they're defective, you see condensation. These are on mats to avoid any damage from the cement floor. They're on mats. If there's any condensation, you see the condensation on the tanks. Here, that was not the case. So therefore, our client relied on the August 31st termination that was sent to them September 17th. And our client says in his deposition, had I known that it was filled July 13th, I would have checked before because he quoted the timing. He says that in his deposition. So he detrimentally relied on their notice that they had filled the tanks August 31st because he detrimentally relied on it. I think the case says he doesn't have to make extensive inquiry and that is Meacham versus Montgomery County, Montgomery Board of Education. It says he doesn't have to do an extensive inquiry because he lied. He relied on what GenX provided him. They provided him a letter and said, hey, we filled your tanks up. We're leaving this territorial service area, but you're good to go. But we filled you up on August 31st, 2015. Our client assumed he had 12 weeks of gas at that point in time. He certainly inspected inside the tanks inside of that 12 weeks. Little did he know the tanks were dead because, in fact, GenX had breached the contract by not filling up like they said they did. An inspection would not tell you the level, how much is left in it? If you inspected tanks, could you tell whether there's 12 weeks left or two days left? I think you can, yes. Did your client do that? Well, obviously, he didn't do it between July 13th and October whenever he inspected those tanks. He only inspected them outside visually. So July, you got, what, July, August, September, October. There were three months. It was less than three months. Well, two months. He didn't check the level in there to determine if he had 12 weeks or what? This was outside of the breeding season, so they weren't inside the tanks every day. Did he normally do that? No, sir. You do not. And there's no testimony in the record that other farms or other experts inspected the tanks by going inside the tanks. They probably do now, don't they? Well, if they had their fleet, they would. Okay. What's incredible about this is that you've got this tank in the office. There's a tag on one that tells you that it's July 13th. That tag is not reliable. There's dates on that tag that are missing that we've later discussed. It may be, but if it says July 13th, it's a flat. It may not be, as you say, reliable, but if you've got millions of dollars, you go and check that thing out. With a 15-year relationship, Your Honor, respectfully, if you're getting billed four times a year from a company you've been doing business with, and they say, we filled your tanks from this date, you have a good relationship with them. You've never had any problems with it. You're going to assume they filled it. But this is the end of the relationship. Yes, sir, it is. You terminated the contract. You would think on the time they say, okay, we're not going to do this. You would at least check to see. They say they did that. I want to make sure that what's in that tank is in that tank. And you're saying they were being expected, but only ... Why look on the outside? What was the purpose of looking just to see if it was already dry or what? Because you couldn't tell how much was in there. So if you could see that it's good today, but if you only were expected tomorrow, it could be bad. The tanks are only going to dissipate if the tanks are defective at that rate, inside a 12-week rate. Here, our clients knew that they had good tanks. They've been inspected since this lawsuit was enacted, since this claim was made, and they're good tanks. Our client knew, hey, I have good tanks. They sent me a bill. All I've got to do is check this every day to make sure our tanks aren't defective. They don't see any condensation every day. There's no defective tank. Had our client had a defective tank and it leaked, obviously his failure to inspect or monitor would fail here. So they only monitored to find out whether the tanks were defective. They didn't monitor to find out whether the tanks were full or half full or ... Yes and no, ma'am. They monitored them in season, which we're now talking about out of season, August 31st. They monitored them in season because they were inside all the time, which means the gas is going to dissipate more frequently. Outside of season, they tried not to, on purpose, go in the tanks because that helps deplete the fleet. So it's a catch-22. It's a double-edged sword to go inside the tanks outside of season because you can let the LN2 levels dissipate and your fleet dies. All right. Thank you. Thank you. Good morning, your honors. I'm Matt Little and I practice with T. Campbell, Denison, Gorman, Raleigh. My partner, Becky Thornton, and I represent GenX Cooperative, which is a genetics company from Wisconsin that specializes in cattle breeding. There are three issues in this case, and you all have focused primarily on the most pertinent one, which is Mr. Edwards' failure to monitor these tanks. And there are some specific- These tanks are not defective. No contract. So there are written contracts which were attached to the answer. All the witnesses were questioned about them during the course of discovery. They were signed- It doesn't pertain to specific tanks that were involved here. That's where all the damages come from. Well, I think then if that were correct, we would have a course of dealing argument based on the terms of the written contracts, which have governed the party's actions. Tell me first, is it correct? I would have to go back. I think several of the serial numbers for the contracts- Well, let me put it to you differently. Well, did they raise that in the district court? Not until the summary judgment stage. Similarly, they didn't raise the issue of the lack of written contract until after discovery closed. We weren't aware that they were taking the position that this was an oral contract until after we finished all of the discovery, which is a real problem because we would have talked to the witnesses about that issue. Nevertheless, let's say it is an oral contract. They received written notice of cancellation, which Dexter Edwards acknowledged receiving in September. That's it. That's the end of the relationship of these parties. The loss doesn't occur until mid-October. So if there is an oral contract, which there's not, there are written contracts which govern these parties' terms, then the contract ended a month before the loss. Well, but if the breach occurred before the contract ended, that doesn't- I mean, that's not a winner for me anyway, yeah? So the evidence is uncontroverted. Corey Peters testified that he was absolutely certain that he filled those tanks on schedule on July the 13th of 2015. That's in his sworn testimony. He gave them two separate pieces of evidence on the day he did so. One, he filled out the tag on the side of the tank. And second, he left a receipt on Nicholas Edwards' desk showing that he had done so. Now, Mr. Edwards didn't keep the receipt, so we don't have it in discovery. But Mr. Peters testified those are the two things he did. Then he went back, entered this data in the computer, and that's where the clerical error comes in, where the bill isn't generated for about another month and a half. That's not a breach of contract. They received the product that they paid for. They paid for that product, okay? When this lawsuit started, Judge Diaz, one of the first things we did was, they used the word negligence in the first complaint. And we made a 12v6 motion. And we said, this is a contract between the parties. Under the Ports Authority line of cases, if you have a contractual relationship, the terms of the contract govern the relationship. You don't have a negligence claim here. And in response, the plaintiff said, we are not making any form of a negligence claim. Our sole claim for relief is breach of contract. What they're saying to you now, is they're essentially arguing a negligent misrepresentation claim and detrimental reliance. What about just a general claim with respect to the duty of good faith and fair dealing? They say, you know, they were misled. Whether you want to characterize that as negligence or otherwise, that as part of the contractual relationship, you had an obligation to correctly inform them of when you did this work. That is, fill the tanks and you gave conflicting information. Why isn't that a breach of the duty of good faith and or fair dealing? Okay, so that goes more, Your Honor, to the question of whether there was a material breach versus a trivial breach. To breach the duty of good faith and fair dealing, we would have had to do something to act in bad faith. To act in some way other than a simple clerical computer data entry error, which is the testimony of the folks from GenX. When they went to Wisconsin and deposed all of my clients, they asked them all, how did this happen? What was the nature of this mistake? And they received testimony from the witnesses that this was a data entry clerical error committed, not by Mr. Peters, but by the folks back in Wisconsin. So to breach a data of good faith, we would have to act in bad faith. And we did not do so. There's no evidence in the forecast of the evidence by the plaintiff before Judge Boyle that we acted in any way in bad faith. The second and I think the most pertinent issue goes to the duty to monitor. And Mr. Thompson said several things that I do not think are correct. The LN2 does not, even in a brand new tank, the LN2 does not last indefinitely. It's cooled to a very high degree, which is why it refrigerates these things and keeps them for years. And I hate to stop your train of thought, but I just want to get back to this issue of the breach. As I understood Mr. Thompson's argument, the breach was that you promised to fill the tanks on not July 13th, August 31st, is that the date? Whatever the date was. And that, and you failed to do that. And that's the breach of contract. What's your response? So he's just wrong. The tanks are filled every three months. The three month window to fill those tanks was July the 13th when it was done. If we would have waited till August 31st to fill the tanks, they would have been empty at the time they were filled then. So the schedule, the regular schedule for the filling of these tanks... And this was a schedule that had been going on for how long? 11 years. Well, longer than that, but 11 years pursuant to these written contracts. He says 15 years. Okay. They did business with each other before... You see the problem. You do business with someone for 15 years. He just relies on them doing whatever they tell him. He's saying the course of conduct here is over 15 years. They just rely on you filling, basically ceding to your company to do this. And maybe you accept it or whatever. And when you represent, well, August 31st or whatever, they didn't go and check and see if it was July 13th or whatever. They've been working for 15 years. So they had no reason, didn't feel like they had a reason to go and have to check that. Because you told them it was August 31st and for 15 years you've been pretty reliable. And all of a sudden, what puts them on notice that now, after 15 years of doing business for you and you are like clockwork, doing it just on time, as you said there, tanks of fuel every time they rely on it, they know it. And the last, when you get ready to terminate, you then make perhaps what might be the only mistake you've made in the whole 15 years. And that is, it's August 31st instead of July 13th. And their position is, without the contract, this is an oral contract, I think if you get into the contract aspect, you've got a strong language on the monitoring. But if you're dealing with an oral contract, their position is that the course conduct allows them to rely reasonably on this. Two reasons, Your Honor. One is, there are safeguards built into the system. Both, there is in the original contractual language, it says, customer accepts full and sole responsibility to maintain LN2 biostat in good operating condition to monitor LN2 routinely to make the LN2 tank fully accessible to GEDX representative for servicing. That's except there's a contract, right? Okay. Also... If there's a written contract, but you're reading. Well, I agree. I want to be clear. I mean, it seems though, your position is there's a written contract. You look at the contract, there's an analysis there. If there's not a contract, then it's the oral contract that we're talking about, right? So the problem with an oral contract is multifold. One, there was no meeting of the minds. There was no questioning of my people about an oral contract. They didn't put on evidence about what the terms of this oral contract were. Judge Boyle in his order noted that there was no date certain. If you take this as an oral contract, then it can be terminable at will by any party at either time. Are you saying that if there is not a written contract, then there was absolutely... There wasn't even an oral contract. There's nothing. You had no agreement. Is that your position? No, I think there was a written contract. I understand what you think on a written contract. I'm just trying to differentiate the issues. Sure. I understand you maintain there's a written contract. But is your position, if there is no written contract, is your position that there was not a contract at all? No. Well, then the second question is, was there an oral contract? If there was an oral contract, it was under the terms of the written contract because those are the terms the parties have been dealing with. You and I are speaking the same, communicating. And the first thing is, either there's a contract or not a contract. Yes, sir. Either there was a written contract or an oral contract. Yes, sir. You say if there was not a written contract, you're not saying there wasn't a contract. Are you saying there was an oral contract? Yes, pursuant to the exact same terms as the written contract, which governed the party's course of dealings for 11 years. That's how we did business with them. Those were the terms we did business with them under. You have to understand, they're making this claim saying they had millions of dollars of product in there, which is hotly disputed. This LN2 is 30 bucks a tank. It's $210 for the total service call that we're talking about here. There is no way on earth that GenX or anybody in this industry is going to guarantee these folks millions of dollars of product for a $200 supply run without having safeguards. Those safeguards include the duty of the farmer to routinely monitor. There is absolutely testimony in the records from their experts, from our clients. I think that is disputed as to where you're going with that. Nobody recently is going to guarantee it. I don't think you would guarantee it. The question is, when you make a representation, August 31st, and do they reasonably rely on putting that representation to say, we've got this much in based upon your course of conduct over the 15 years. It's not a question of whether or not you've insured or not, but you say, I feel this tank on that date. That's not an insurance. That's just saying what you did. The failure to do it or to have done a date, does that amount to a breach? If so, what are the damages? No, it doesn't amount to a breach because, again, we briefed this, the issue of whether it's a material breach or a trivial breach. I'll rely on the brief for those arguments, the legal arguments. But we also, under any scenario, there's a green, neon green sticker on all those tanks that's in evidence that tells them, you have to check these. You have to monitor these. The way you monitor them is you take the lid off and you stick a ruler, a black stick ruler in there and you check it, right? Okay, so with respect to that, Mr. Thompson got up and said, well, that's in dispute because it depends on whether or not it's within the breeding season or not. If it's outside of the breeding season, we have a sort of a diminished duty to monitor, which simply requires that you look at the exterior of the tank to see if there's condensation. Is that in the record? He's conflating the issue of an outright failure of the tank and the substance naturally degrading over the window of time. You have to fill these tanks every three months, no matter what, whether the tank is failing or not, what he's talking about. I want to be sure that you're just not educating us based on your understanding. This is all in the record. The issue of the tank failure due to a vacuum seal failure is what he's talking about. That's when he talks about the condensation? Yes, ma'am, and that's from the testimony of their expert, and it's in the record. There's a difference, and like I said, he conflates the two issues. The substance naturally expires, and I think it's called sublimation, is the physical concept, the scientific name for it or whatever, but this is supercooled gas. As it warms, it turns into vapor and leaves, right? And so that doesn't last. That's why it has to be refilled every three months, regardless of whether the tanks are failing. If you have a tank that's failing, that you have a puncture in the tank, and you have a loss of vacuum, then it will do exactly what Mr. Thompson talked about, but that's not the same thing as the regular using of the substance, okay? So Mr. Edwards, our people only go out there every three months. Mr. Edwards is there every day. His son is there every day. So it doesn't matter whether it's breeding season or not breeding season, the substance is naturally going to supplement, I think you said, right? Yes, ma'am, and it will go away. We fill these tanks every three months or more as needed. If they're in and out of the tanks, as Mr. Thompson talked about a minute ago during breeding season, then the substance will go away faster. They can call for a refill. One of the things that they've raised and we can talk about briefly is this issue of oppression in the contract and against public policy. When Nicholas Edwards realized that they were low on this coolant, he called somebody and there was somebody there that day. This is something you can buy from lots of vendors. They have a vendor now who testified in this case. So it's not as if my client had a corner on the market and they couldn't choose other terms other than the terms that we agreed to with them. They had lots of options. They had an option that day. It's not, you know, there wasn't any shortage of this product or difficulty in obtaining the product. So our position is that the terms of the written agreement which had governed the relationship between the parties are the terms, even if you say the tanks as they replace tanks with age and they wear out, that's still how we operated with them. Those are the terms we agreed upon with them. If they were going to raise this issue of there being some other set of terms, an oral agreement, then we needed to know that during the discovery window. We need to talk to the witnesses about it. It is not appropriate to wait till after the close of discovery and challenge the existence of these terms. So the other thing that they raised is this issue of Chapter 75 and that's pretty clear in the brief. In order to have a normal breach of contract or even an intentional breach of contract is not a Chapter 75 claim under North Carolina law. I know both Judge Diaz and Judge Winn when they were on the bench in North Carolina dealt with that issue. It's a routine claim that gets made. But you have to have some egregious conduct, some really deceptive unfair conduct. And the only evidence in this case is that there was a clerical error in the billing department at Gen X in Shawano, Wisconsin. If the plaintiff had other evidence to say we did something egregious other than this one clerical error, they had an opportunity to present that to court during discovery and they did not do so. And the last thing I'd like to hit on and then I'd be happy to answer any questions the panel might have is there's a general causation issue here. If Dexter Edwards had checked those tanks at any time that after he got that cancellation letter, he would have realized the coolant was becoming low and this thing wouldn't happen. That's his duty. Whether you call it a common law duty of negligence, it's his property. It is his responsibility to do that and he failed to do so. His son testified and I can quote you the section of the record that he from June, the last time he looked at those tanks was June of 2015 until October. Never once did he measure the level of coolant during that window of time. If he had done so, this loss doesn't happen. It doesn't need to happen. It's such a simple thing for them to do and the reason it's their duty to do that is they're the ones that are there. So, the contract that there was a contract at a 60-day notice of termination. You gave the letter on September the 13th. Does that mean your obligation ran until like November the 16th or something? No, sir. The letter itself says unequivocally that the contract is terminated at that point. If they wanted to make a claim and said, hey, we incur additional cost because we were unable... It does. So, where was the 60 days? It didn't happen. You're right, Judge. Why? Because they pulled entirely out of the state of North Carolina is the short answer to that question. They don't serve the stat territory at all anymore for this product. So, that was a way for you not to comply with the 60-day notice by saying I'm going to pull out of North Carolina and therefore I don't have to give you 60-day notice? Correct. They did not give them the 60-days notice. What I would say in response is, if they had a claim saying we incurred additional cost or we couldn't find a supplier because you didn't give us enough time, then that would be a claim. That's not what they've alleged. They don't base any damages on that claim. That's not the gist of their claim here. No matter how you slice it, they knew that we were not coming back out. They had been told in writing and they acknowledged receiving it. So, they had an obligation to do two things. One, find a new supplier. And two, keep an eye on your stuff. That was their obligation. Here's one for you. Yes, sir. So, you say that possibly was a breach, but there was no damages flowed from it. If your obligations ran to November 16th, would you not have had an obligation to fill that tank again three months after June or whenever, July the 13th before November the 16th? If we had agreed to continue doing business with them, the tanks would have been filled. Not my question. My question deals with the notice of termination. If the notice of termination says that you have to give 60 days before you can terminate this contract and you've admitted, well, at least you've said, you didn't give 60 days. You pulled out of North Carolina. And there's no exception of that in the contract. Well, we just decided we're not going to do business in North Carolina. We won't give you any notice. There's no exception in the contract. Just hear me out on this. Sure. Because I'm trying to figure this thing out. So, if you fail to give notice of the termination, as you should have for 60 days, and if it can be discerned from that, well, your obligation, at least contractual obligation, continues for 60 days because you have to give a 60 day notice. If you were obligated to fill that tank within the 60 days and did not do so, why is it not a material breach? Two reasons. One, that the 60 day notice, both in the written contract and in the notice of cancellation, is to give Mr. Edwards time to find a new supplier. He did do that and was able to do that on three hours notice. Well, that's true. But during that 60 days to give him time, whether he in fact did or not, you have a contract that's going for 60 days. And whether he gets another supplier, he doesn't need a supplier until the contract ends. So, if the contract doesn't end until the 60 days, which is November 16th, yeah, he could be looking for someone. He's got someone. Come in November 16th because you have an obligation in between to fill the tanks. We ended the contract as of the date of cancellation. I do not agree the contract continued. There's nothing in the cancellation notice which indicated that we would ever come back. Nor did we. That much I understand. You say you ended it. I agree. Yes. You don't agree that it continued. But you also acknowledged you had to give 60 day notice to terminate the contract. And you did not give 60 days notice. True. And the question is, if you didn't give 60 day notice, when did the contract terminate? Was it 60 days later? Is there a case law to support that? If someone says, I'm going to give you 60 days notice. Come in and say, no, today is ended. Does there a case law that says, no, you have to follow by the contract and it remains in effect for 60 days? Is there a case law to that effect? And I'm looking at my red light. May I have additional time to respond to your question? I'm talking to you. Oh, good. Thank you. Then the answer is, I don't know, Your Honor.  Neither one of us argued it. Everyone operated on the assumption that the contract... We kind of look at all kinds of issues. And you know, to be honest with you, I hadn't really thought about it until you brought it up right then. It's kind of an interesting point there. And I'm not even sure the other side has developed that point yet. But I think that's an interesting point. If there's a written... But now, here's the conundrum. They say there's not a written contract. So I don't know how you get a one answer. There's not a written contract. And it says, well, you know, because there's not a written contract, there's an oral contract, et cetera. There's no 60-day period in an oral contract. If you accept... Maybe you ought to be saying there's not a written contract. If you accept Mr. Thompson's premise, the contract is terminable at will under North Carolina law. And it was. I guess the other issue, though, is if there is a written contract, and all of that flows from Judge Wynn's questions about bridge, that contract also has an express waiver of consequential damages. So I don't know that that gets them anywhere. It absolutely does. And it gets back to the baseline reason that we put that in there, because you're talking about $30 worth of product supposedly guaranteeing a $6 million loss. We'd be insane to do that. And I didn't mean to indicate it would be a slam dunk. You still... The contract has all of that monitoring requirement in it. That's pretty, pretty strong stuff that requires them to do it.  So not only is it in the written agreement, there's a big sticker on the tank that tells them. So even if they say... They said the dates sometimes. You didn't have the dates up there right and stuff. That's the tag. There's a big neon green sticker that's in evidence that specifically tells them that they need to take care and monitor the stuff. What do you mean neon green? You mean it's flashing? Or you mean you just walk in and you see it? It looks like that new mellow yellow soda that the kids love. When the lights go out and it pops up? No, but it's like pretty bold. Nicholas Edwards' testimony acknowledged that there was that... That they did put that sticker on there. He just never looked at it. Yes, ma'am. Thank you. Thank you, Your Honor. You've got a few minutes of rebuttal. Thank you, Judge. Judge, I'm the last one. I'm Gene Thompson. Obviously, my son argued before. If I may, I want to restate the issue that the court just briefly focused on. I may apologize. I've got sinus and sometimes I get in here... You need to get some water. Are you okay? We've got time for you to get a little water if you want to clear your throat up. It's fine. Okay. Reference to what Mr. Little said, and I agree with the court, the monitoring issue is critical in this case. The best evidence we have by far that these tanks were properly monitored is for 15 years. There was never a problem. Never one problem with malfunctioning of the tanks or giving out of LN2 until Gen X came and said, we filled your tanks on August 31st. We reasonably relied upon that fact. Throughout the record, on at least three or four different occasions, in reference to questions to Mr. Edwards, he testified... When you say you reasonably relied, is that an estoppel argument you're making? That is an estoppel. That's part of our argument. I want to address the monitoring didn't go to the estoppel, if I may. Okay, well, go ahead. But I want you to deal with it because I think the estoppel prospect, I want you to address it from the perspective that did you have an opportunity to discover the truth? The estoppel, you can lose that if that's available there to you. I understand. Just throughout the entire time, the 15 years, and we must remember that the last territorial sales manager did not even come on board until 2012. So this sticker on the tank was no up there. It's from 2004 to 2012. I think it was almost nine years. During that nine-year period, the course of trade custom was that the Edwards, Mr. Dexter Edwards relied upon the invoice when the tanks were filled. He always sent an invoice for $210, no matter how much they refilled it. The course of conduct in this case created a duty by GenX to fill those tanks basically every 12 weeks. Therefore, they argued we didn't have a duty to fill the tank except every 12 weeks. I think that issue was raised while ago. If I can articulate this, I disagree. Because the custom part of the discovery when we ask the question, is it the custom of GenX to fill the tanks when you terminate service? Yes. How? By giving 60 days. In that context, whether we're talking verbal or written, it makes no difference. There was a contract. There had to be some type of contract. Therefore, when they said we are quitting service, they had to give us a fill of the tank. Not only did they fail to fill the tanks on August 31st, which they characterized as a clerical error, we characterize it as a colossal breach. Then when they filled those tanks in, that told Dexter Edwards, we've got at least 12 more weeks before we have to worry about it. He relied upon that. They then had a duty not only to fill these tanks periodically every three months, they had a duty to fill those tanks when they reached that contract in order to give Dexter Edwards ample time to find another provider. He didn't have the time because they never filled them, as we know. Like I said, they never filled them the time they had a duty to, and then they represented that they had filled it when, in fact, they had not. Now, the monitoring issues are made. If the monitoring issue required us to go into the tank, we agree that to precisely determine the level, yes, you may have had to go in the tank. But for 15 years, we monitored, as my son said, by looking at whether it was condensation, because if the LN2 gets low, there's a condensation. But that monitoring about the condensation was only to see if there was a fault in the tank itself, not whether the level of nitrogen, the level of whatever that stuff is in it. Thank you, ma'am. I agree, but I think Edwards said the only way that tank would be faulty is if the nitrogen got too low. So it never did get low. Now, Dexter, the daddy, and Nicholas, this office was right there, 50 feet, and they all lived. They were in and out of that office multiple times all these years. They checked it one by looking at the condensation, but they further checked it, and the record is replete with this. The tank weighed about 80 pounds when it was full. It weighed about 30 pounds when it was light. They picked those tanks up all the time to check. Now, if it was so critical that they go into the tank in order to pop it, why didn't they at least suggest by lever, by compensation or something, oh, we want you to monitor your tank, and this is how we want you to do it. I can go buy a bracelet from a jewelry store here and tell you how to wear it, but here with this highly negotiable LN2, which allowed Dexter Edwards and his students— Mr. Thompson, can I just ask you a question about what you just said? So you said that they monitored the tanks by lifting them up and checking the weight of the tanks. Yes, sir. Is that what you said? Yes, sir. Wouldn't that show if there was a drop in the nitrogen, a substantial difference in the weight if they had done that? Exactly. Yes, sir. But how does that help you? If they didn't do that, then— All right, let me even—I'm glad you asked. Thank you, sir. They did that for 15 years. Then on August the 31st, represented they had filled the tank. Now, if you hadn't used any of it substantially, then only six weeks later on October the 12th, and not having used any, they had reason to think that it was still okay because this was out of season. So they must not have— you said they lifted the tanks up all the time. It sounds like they didn't lift them up between August and October. They lifted them up at the time after they used it. Let me put it this way. If you fill your car up with gas and not trying to trip your car, we don't go into the tank to see it. We do the needle. And I know that's pretty precise. It wouldn't be accurate. We could put our finger down there and find out. We don't do that. We use a needle. That was in the old days. Well, yes, I remember that. I have to agree with you on that. Let me ask you— Through the years, through the years, the custom— Let me have your attention just a moment. I'm sorry. I want to ask you one thing with regard to when the filling occurred. When GenX came to your client's facilities to fill those tanks, did they come in the dark of the night or did they— was the door just left open for you? You didn't know they were there or did they— did you let them in and they— tell me how that happened. Throughout the entire course of dealing with GenX, they came unannounced on many occasions. Was anybody there or did they have to be let in or how was that done? They came and went in by themselves. So the door was just open. The doors are open and nobody's around that monitors or sees them coming? That's the way it happened, yes. You left millions of dollars' worth of equipment there and people could just walk in and walk out? I don't think there were millions of dollars' worth of equipment. This was just an office. The tanks were there— They had millions of dollars of whatever it is in those tanks. We could have— We could have— Had we been able to recover the consequential damage, we could have made it in the millions. I want to be clear. Are you representing— It seems to me, you know, it was highly unlikely that GenX came in there without there being somebody there to say, okay, here, we see you here. You may just sort of ignore them, but somebody is there, I would think. And it's not that— It's not going to happen at 12 o'clock at night when everybody's sleeping and they came and did it. Nobody know you came in. And there was testimony. I don't think it was rebutted that he left a receipt. He would leave a receipt showing that he'd filled it. In this instance, he left a receipt showing that it had been filled on July 13. You don't have that receipt, he says. Nonetheless, if that's the conduct of what was going on, I'm just trying to determine, when the tanks are being filled, were you there? Not necessarily to answer your question there. When the tanks were being filled— Would you know that they— The day— Would you know they're on your premises the day that they are there? Not necessarily. I mean, first of all, Dexter had his work somewhere else. Daddy did. And Nicholas ran the farm. I gotcha. But anyway, talk about the value. According to Mr. Lilley, he said it was $210 worth of LN2. That's not highly negotiable or highly valued. What they could reduce would be high. And as we have— When you get into damages, I don't think the damages are before the court here, but we say we could reduce that amount of money. Well, the LN2 was not that expensive. It was like $30— Your time is up. Go ahead and give us your concluding thoughts. All right. Well, my concluding thoughts are, at the very least, the monitoring issue would be a question of the jury, because it worked for all those years. Second, we— They say they didn't have a duty to put it. We say, for the reason I just stated, they did have a duty. Thirdly, you know, they hadn't been mentioned too much here. We say there was no written contract, because I don't think there's anywhere in throughout the record that indicated that Nicklaus had any authority. Just because he manages the farm, I don't know, continued to cow 24-7, does not say he had authority to sign the contract. There was nothing— They never forewarned, discussed it, did anything to shatter the contract. We think there was a verbal contract, and through custom, which we discovered in our discovery, that they created, by custom, a provision to fill those tanks, and they didn't do it. Whether it was written right or not, they had a duty to fill that tank. They certainly had a duty to do that in good faith. We don't even know that they did rely on a clerical. That's all I have. Thank you, Judge. Thank you, both sides, for your arguments. We will come down, recounsel, and adjourn, please. This honorable court stands adjourned. Sin Dai. God save the United States and this honorable court.
judges: James A. Wynn Jr., Albert Diaz, Stephanie D. Thacker